```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
ESTHER CANALES, individually as Mother    :
and Natural Guardian of Infant, E.O.M.,   :
                                          :
                           Plaintiff,     :     REPORT AND RECOMMENDATION /
                                          :                  ORDER
           -against-                      :
                                          :          19 Civ. 834 (EK) (VMS)
                                          :
UNITED STATES OF AMERICA, NYU             :
LUTHERAN HOSPITAL a/k/a NYU LANGONE       :
HOSPITAL BROOKLYN, DR. KAYLA              :
CAGLE-COLON, and DR. JACQUELINE F.        :
FORD,                                     :
                                          :
                           Defendants.    :
------------------------------------------------------------ X
```

**Vera M. Scanlon, United States Magistrate Judge:**

Before the Court is an application filed by Esther Canales ("Ms. Canales"), Chris Mayen ("Mr. Mayen") and Midland Trust Company (together, "Petitioners"), as co-trustees for the E.O.M. Settlement Trust (the "Trust"), to use funds from the Trust to purchase the real property located at 20180 NW 9th Drive, Pembroke Pines, Florida 33029 (the "Property") in the Trust's name, and to use funds from the Trust to pay homeowner's insurance and property taxes for the Property, expenditures related to the Property, closing costs for the Property and minor repairs on the Property amounting up to $5,000 per year.[1]  For the reasons stated below, the Court

---

[1] Petitioners' application also asks for Court approval to use funds from the Trust to 1) purchase a vehicle to transport E.O.M., along with the maintenance and gasoline costs for the vehicle; 2) pay commissions to Ms. Canales and Mr. Mayen, pursuant to N.Y. Surr. Ct. Proc. Act § 2309 without further Court approval; and 3) to pay the Robert Legal Group, PLLC, attorneys' fees in connection with this application.  The Court will not presently issue a report and recommendation as to Petitioners' additional requests for relief at this time, as such relief is not subject to the same time constraints as the application to purchase the Property and those requests require additional information.  Petitioners are referred to the conclusion of this report and recommendation for a list of supplemental submissions required as to these three requests.

1

respectfully recommends that Petitioners' application as to the Property only be granted.

## I. BACKGROUND

Ms. Canales brought this medical malpractice action in 2019 on behalf of herself and her infant son, E.O.M., for injuries they both sustained during E.O.M.'s birth. See generally ECF No. 1. E.O.M. "suffers from cerebral palsy and epilepsy and is wheelchair bound and nonverbal" and "cannot perform any activities of daily living unassisted." ECF No. 90-1 at 3.[2]

After extensive discovery, the parties reached a settlement in principle and sought approval from the District Court for an infant compromise Order. See ECF Nos. 73 & 74. The District Court entered an infant compromise Order, pursuant to which E.O.M. would receive $3,689,864.71 in up-front payments and an anticipated $3,451,275.01 in future periodic payments, and Ms. Canales would receive $1,000,000 in an up-front payment. See ECF No. 84 at 3-5. As part of the infant compromise Order, Defendant United States of America was required to purchase two annuity contracts, which would make monthly payments $2,095.40 and $1,924.07 respectively to the Trust for E.O.M.'s lifetime. See id. ¶ 12. The infant compromise order also specifies that the New York State Medical Indemnity Fund ("MIF") would provide for E.O.M.'s medical expenses, and that the Trust would "enhance the quality of life of [E.O.M.] by supplementing the services that the [MIF] will provide[.]" Id. at 6. In addition, the infant compromise Order states that distributions may not be made from the Trust before E.O.M. reaches the age of majority without a court order, and that "any application for the purchase of real property shall be made . . . to a court of competent jurisdiction[.]" Id. at 6-7. Pursuant to the entry of the infant compromise Order, this action was dismissed in November 2022. See 11/2/2022 Dkt. Entry.

---

[2] All references to documents filed on ECF will use ECF pagination.

In October 2023, Ms. Canales, Mr. Canales and E.O.M., along with E.O.M.'s brother and paternal grandparents (collectively, the "Family") moved to Pembroke Pines, Florida, in order to seek improvements to E.O.M.'s quality of life. See ECF No. 90-1 at 3. The Family moved into a three-bedroom rental home and enrolled E.O.M. in a special education program called Kids "R" Kool PPEC. See id.

On March 7, 2025, after an extensive search, the Trust signed a contract to purchase the Property for $855,000. See id. at 45. Pursuant to the contract for sale, the Trust was given until June 7, 2025, to obtain Court approval to purchase the Property, although the contract allowed for the Trust to seek extensions of time to obtain Court approval. See id. at 37, 43.

After the contract to purchase the Property was signed, Petitioners filed a letter asking to re-open this case for the purpose of obtaining Court approval to purchase the Property. See ECF No. 88. The District Court granted Petitioners' request, and Petitioners filed the instant application. See 5/28/2025 Order; ECF No. 90. The District Court referred Petitioners' application to the undersigned for a report and recommendation.

Following the District Court's referral, the Court held a conference to discuss Petitioners' application, during which the Court advised that Petitioners were "encouraged to promptly seek an extension of time to complete the contract for sale and purchase from the buyer[,]" as the Court "may ask for supplemental submissions" regarding the application. 6/4/2025 Order. On June 23, 2025, Petitioners informed the Court that they had secured an extension to complete the contract for sale until July 30, 2025. See ECF No. 91.

After reviewing Petitioners' application, the Court required Petitioners to supplement their application with additional information and encouraged Petitioners to seek a second extension of the contract. See 7/3/2025 Order. Petitioners filed their supplement to the

3

application three weeks later.  See ECF No. 92.

## II. DISCUSSION

### A. Applicable Law

When seeking to withdraw or spend monies held by an infant, an infant's guardian is "obligated to preserve, protect and manage an infant's property and shall not make or suffer any waste, sale or destruction of such property." In re S.M.M.Z., 910 N.Y.S.2d 765 (Table), at *1 (N.Y. Surr. Ct. Bronx Cnty. Apr. 29, 2010) (citations & quotation marks omitted).  In order to ensure that the "best interests of the infant" are protected, id., New York imposes both procedural and substantive requirements on an application for expenditure of an infant's funds.

As to the procedural requirements, an application to withdraw and spend monies belonging to an infant must contain:

> (1) a full explanation of the purpose of the withdrawal; (2) a sworn statement of the reasonable cost of the proposed expenditure; (3) the infant's age; (4) the date and amounts of the infant's and parents' recovery; (5) the balance from such recovery; (6) the nature of the infant's injuries and present condition; (7) a statement that the family of the infant is financially unable to afford the proposed expenditures; (8) a statement as to previous orders authorizing such expenditures; and (9) any other facts material to the application.

N.Y. Comp. Codes R. & Regs. tit. 22 § 202.67(f).  In addition, a court must ensure that the infant's parents, "except for unusual circumstances," are not "financially able to support the infant and to provide for the infant's necessaries, treatment and education." N.Y. Comp. Codes R. & Regs. tit. 22 § 202.67(g).

The following factors set out in Matter of Marmol, 640 N.Y.S.2d 969 (N.Y. Sup. Ct. N.Y. Cnty. 1996), outline the substantive requirements for court approval of "the use of infants' funds for the purchase of a family home[:]"

> 1) by clear proof the parents show they cannot afford the purchase price or a portion thereof; 2) the house has features beneficial to the child and

4

> accommodates his physical limitations; 3) the purchase price is fair; 4) title is vested in the child at least to the proportionate degree of his investment in the house; 5) necessary measures are taken, where needed, to safeguard the investment against the profligacy of the parent; 6) parents offer a quid pro quo; and 7) the funds remaining after the outlay are sufficient to meet the future needs of the infant and where the child is expected to remain incompetent, for the anticipated duration of his life.

Id. at 975. In Marmol, the court found a sufficient quid pro quo when the infant plaintiff's parents offered to pay "[t]he cost of maintenance, mileage and insurance" for an automobile sought to be purchased using the infant's funds. Id. at 973-74.

### B.     Analysis

Petitioners have satisfied the requirements for an application to spend an infant's funds as set out in the New York regulations. As part of the original application, Petitioners list the expected withdrawals from the Trust in connection with the purchase of the Property, including $855,000 for the property itself, an estimate of $12,000 for closing costs, $525 for an appraisal of the Property and $113.50 for a home inspection of the Property. See ECF No. 90-1 at 6-7. As to the annual expenses on the Property, Petitioners' initial application states that the Trust would pay $7,682 per year in real estate taxes. See id. at 6. As part of their supplemental submission, Petitioners provide a quote of $11,793 per year for homeowner's insurance, which "covers flood risk pursuant to discussions between Midland Trust Company and [the servicing agent for the homeowner's insurance company]." ECF No. 92 at 3; see ECF No. 92-8 (providing the homeowner's insurance quote). Petitioners also seek, as part of their original application, to use trust funds of up to $5,000 per year to perform routine maintenance on the Property. See ECF No. 90-1 at 6. Petitioners provide that "the adult members of the [Family] will pay for all utilities." ECF No. 92 at 1. These statements are satisfactory to show both the purpose of the proposed withdrawal from the Trust and the cost of the withdrawal. See N.Y. Comp. Codes R.

5

& Regs. tit. 22 § 202.67(f).

The Court finds that the remaining requirements set out in the New York regulations are also met. Petitioners' application states that E.O.M. is seven years old, see ECF No. 90-1 at 3, and that due to E.O.M.'s cerebral palsy and epilepsy, he requires assistance for basic "activities of daily living[.]" Id. Petitioners have attached to their original application the infant compromise Order, see id. at 15-34, which details the settlement recoveries of both E.O.M. and his mother, and authorizes Petitioners to seek approval from this Court to purchase the Property.

As to the remaining balance of the settlement monies, Petitioners' supplemental submission states that as to Ms. Canales's settlement, Ms. Canales has approximately $200,000 remaining from her $1,000,000 settlement award; Mr. Mayen and Ms. Canales state in a letter that "[a] significant portion of the funds was used to pay off debts that [the Family] had accumulated while caring for [E.O.M.], including medical costs, therapy costs, and essential living expenses." ECF No. 92-6 at 1; see ECF No. 92 at 3. As to E.O.M.'s settlement monies, Petitioners have attached to their original application a financial report showing that the Trust has over $4,000,000 in assets. See ECF No. 90-1 at 125.

Petitioners have also demonstrated that the Family cannot afford to purchase the Property without using Trust monies. Petitioners' supplemental submission states that, based on Mr. Mayen's income from working as a remote office assistant, E.O.M.'s grandparents' incomes from Social Security payments and commissions for Mr. Mayen and Ms. Canales as co-trustees of the Trust, the Family's monthly income is only $4,561.58. See ECF No. 92 at 1-2. In addition, the Family currently has approximately $261,000 in assets, plus any returns on the Family's investment in a chicken and pig farm in Honduras. See id. at 1, 3. Making a down payment alone on the Property would significantly deplete the Family's existing assets, and any

6

resulting mortgage would amount to a major financial burden on the Family.

The Marmol factors also support the use of funds from the Trust to purchase the Property. Relating to the first Marmol factor, the Court previously discussed how the Family does not have sufficient funds to purchase the Property on its own.

As to the second Marmol factor, Petitioners have established that the Property can accommodate E.O.M.'s medical needs without costly renovations and that it can give him access to beneficial therapies. Petitioners have filed a letter from the real estate broker for the Trust stating that, due to E.O.M.'s medical needs, the Family could only seek single-story homes, with "wide hallways, step-free entries, and space for specialized equipment[,]" which limited the Family's options to purchase a home in the area. ECF No. 92-4 at 2. The broker explained that homes that met these requirements were not available at a lower price point, and that other available homes would require costly renovations to accommodate E.O.M.'s needs. See id. at 2-3. Petitioners also have filed a letter from E.O.M.'s physical and occupational therapist, stating that the in-ground pool on the Property would provide E.O.M. with regular access to aquatic therapies, which would provide strength and movement training for E.O.M. in a safe, low-impact environment and which are particularly beneficial for patients with cerebral palsy, who often have problems with balance, flexibility and motor control. See ECF No. 92-5. As his physical and occupational therapist explained, an at-home pool is particularly beneficial for E.O.M., as it would permit him to regularly benefit from aquatic therapies without the challenges of scheduling and transporting E.O.M. to such therapies in a clinical setting. See id. at 3-4. The Court is satisfied that the Property has features beneficial to E.O.M. that cannot be found in a property of similar or lesser value.

As to the third and fourth Marmol factors, the Court is satisfied with the purchase price of the Property. Pursuant to the contract for sale, see ECF No. 90-1 at 36, Petitioners obtained a fair market value appraisal of the Property which appraised the Property at $860,000, $5,000 more than the Property's purchase price. See id. at 42, 60. Furthermore, as title of the Property would entirely vest in the Trust, the Property would become a Trust asset, which may be sold in the event that the Trust would need to raise funds. See id. at 40. Having the Trust retain complete ownership of the Property protects E.O.M.'s interests by "securing his investment against liens and attachments as well as protecting [the Property] against mortgages or use as collateral against loans made by any family member now or in the future." Marmol, 640 N.Y.S.2d at 975.

The fifth and sixth Marmol factors, that measures would be taken to "safeguard the investment against the profligacy of the parent" and that the "parents offer a quid pro quo[,]" are also satisfied. Id. The fifth factor may be met if the requested expenditures "to be authorized are limited by specific dollar amounts[,]" to which costs to cover insurance may be an exception. Joyner-Peck ex rel. Joyner v. State, 992 N.Y.S.2d 612, 618 (N.Y. Ct. Cl. 2014). Here, Petitioners limit their expenditures to the purchase price of the Property, closing costs for the Property, homeowner's insurance on the Property and a limit of $5,000 per year for maintenance for the Property. See ECF Nos. 90-1 at 5-7; 92 at 3. The Court finds that these expenditures, which can be independently verified if necessary and are limited to certain authorized items, are reasonable.

The Court also finds it appropriate to use Trust funds for ancillary costs for purchasing the Property, such as the appraisal, home inspection, closing costs, homeowner's insurance and regular maintenance. Closing costs are "part and parcel of a new home purchase," and the

8

appraisal and home inspection were required conditions to purchasing the Property, pursuant to the contract for sale. Joyner-Peck, 992 N.Y.S.2d at 619; see ECF No. 90-1 at 36. Furthermore, the quoted homeowner's insurance has been negotiated to cover a variety of risks, including flood risk. See ECF No. 92 at 3. The Court is satisfied that using Trust funds to purchase homeowner's insurance, even at the significant annual premium of $11,793, is prudent, as homeowner's insurance "safeguard[s] the investment" of the Trust in the property. Marmol, 640 N.Y.S. at 976. The proposed annual expenditure of up to $5,000 in regular maintenance would permit the Trust to seek prompt and proactive repairs, which may alleviate the need for more costly repairs on the Property in the future.

The Family has also offered a quid pro quo in connection with the purchase of the Property, satisfying the sixth Marmol factor. Except for homeowner's insurance, the Family "will pay for 100% of the household utilities for the home including, but not limited to, gas, electric, water, landscaping, cable, internet, phone . . . pool maintenance" and homeowner's association fees. ECF No. 90-1 at 8; see ECF No. 92-2 at 3. Petitioners anticipate that these costs will amount to approximately $1,054-$1,154 per month, which the Court expects to increase over time. See ECF No. 92-2 at 3. It is also likely that E.O.M.'s parents and paternal grandparents will provide support, care and proximate socialization to E.O.M. and his brother while the Family lives together in the same home. Although the Family would also benefit from living at the Property, the Family would contribute to the ongoing costs of upkeep of the Property and would contribute to E.O.M.'s well-being while living with him at the Property. This is a sufficient quid pro quo.

As to the final Marmol factor, the Court finds that, even after the purchase of the Property, the Trust would have sufficient funds to support E.O.M. for his lifetime. Petitioners

9

submit, in their supplemental application, a letter from the Regional Manger of Trust Services at Midland Trust Company, the corporate co-trustee of the Trust, saying that at approximately 20% of the total value of the Trust, the purchase of the Property is well below the threshold at which corporate trustees generally reject the use of trust funds to purchase a home.  See ECF No. 92-2 at 2-3.  Petitioners also include a financial calculator report which, assuming a 6% return on investments and a 2% inflation rate on trust expenditures, taking into account the Trust's monthly income from the annuity contracts, the Trust would only increase in value throughout E.O.M.'s lifetime, even after deducting the value of the Property from the Trust.  See generally ECF No. 92-3.  This report also states that purchasing a home would likely save the Trust money in the future, as rent expenses would continue to increase throughout E.O.M.'s lifetime.  See id. at 3.  Given the projected financial health of the Trust, projected increases in rental costs and the fact that the Property would become "an appreciable asset of the Trust[,]" id., the Court finds that purchasing the Property would be a reasonable investment for the Trust.

Beyond the financial justification for purchasing the Property and funding its ancillary expenses, the Court finds that Petitioners have shown that the Property would provide E.O.M. with significant improvements to his quality of life.  As Petitioners state in their supplemental application, the Property's neighborhood in Pembroke Pines, Florida, is near "hospitals that have [E.O.M.'s] full medical records and neurological history[,]" which can provide an "immediate, informed response capability" in the event of a medical emergency.  ECF No. 92-7 at 3.  The Property is also nearby several medical and therapy facilities that serve E.O.M., including physical therapy, neurodevelopmental therapy, outpatient care "tailored to children with cerebral palsy[,]" and E.O.M.'s current school, which provides "some of the best care [Ms. Canales and Mr. Mayen] have ever seen [E.O.M.] get outside of [their] home."  Id. at 2.  In addition, the

Property is in a neighborhood which provides social and emotional support to E.O.M., as he already "knows the local parks, playgrounds, and neighbors" and "is growing in confidence through these community connections[.]" Id. at 3. Taking into account the medical and educational facilities near the Property, and the opportunities for social development in the Property's neighborhood, the Court agrees with Petitioners that losing the opportunity for the Trust to purchase the Property would lead to "[d]isrupting this network [and] losing continuity of care, which is not in [E.O.M.'s] best interest." Id.

### III.   CONCLUSION

For the reasons discussed above, the Court respectfully recommends that Petitioners' application as to the Property to use funds from the E.O.M. Settlement Trust to purchase the real property located at 20180 NW 9th Drive, Pembroke Pines, Florida 33029, in the Trust's name, and to use funds from the Trust to pay homeowner's insurance and property taxes for the Property, expenditures related to the home purchase and closing costs for the Property, and minor repairs on the Property amounting up to $5,000 per year, be granted.

As to the other relief that Petitioners request, on or before 8/15/2025, Petitioners must supplement their application with the following information:

1.   As to the purchase of a vehicle to transport E.O.M., information as to 1) the ability or lack thereof of E.O.M.'s family to pay for this proposed vehicle and the corresponding maintenance costs; 2) a professional opinion or similar information as to whether a vehicle on the list of approved vehicles from the MIF would be available at a significantly less cost, see ECF No. 90-1 at 6, 133-36; 3) detailed estimates of the annual cost of automobile insurance and regular maintenance for the vehicle; 4) a detailed estimate into the annual cost of fuel for the vehicle,

   including the expected trips that E.O.M. would take in the vehicle and the anticipated annual mileage of such trips; and 5) a means to ensure that the vehicle would only be used for the purposes of transporting E.O.M., and not for any other purpose, should the Trust pay for fuel.

2. As to Petitioners' request for Court approval of commission payments to Ms. Canales and Mr. Mayen, Petitioners must provide additional background information regarding 1) whether any party has sought the appointment of a referee, including the reasons why a referee's appointment was or was not sought; and 2) whether any prior requests for payment commissions have been made, the reasons why such requests were or were not made, the outcome of such requests and, if prior commissions were not awarded, the reasons why the Court should award Ms. Canales and Mr. Mayen commissions now.

3. As to Petitioners' request for attorneys' fees in connection with this application, Petitioners must provide contemporaneous time records of the work spent preparing the instant application at ECF Nos. 90 and 92, counsel's hourly rate(s) and support for such rates (e.g., education, years of professional experience).

## IV.     OBJECTIONS

This report and recommendation will be filed electronically.  Any written objections to this report and recommendation must be filed with the Clerk of Court within fourteen days of this report.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Any requests for an extension of time for filing objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen-day period for filing objections.  If Petitioners wish to waive any portion of the fourteen-day objection period, they should promptly notify the District Judge in writing.  Failure to timely file objections will preclude further review of this report and recommendation either by the District Court or the Court of Appeals.  See Miller v. Brightstar Asia, Ltd., 43 F.4th 112, 120 (2d Cir. 2022).

Dated: Brooklyn, New York
          July 30, 2025

*Vera M. Scanlon*
VERA M. SCANLON
United States Magistrate Judge